UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

              Plaintiff,                CRIMINAL NO. 14-20034

v.                            HON. MATTHEW F. LEITMAN

ERRIC DEVOHN WATKINS,

              Defendant.

---

## United States' Response to Defendant's Motion for Compassionate Release

---

Erric Watkins ran an armed narcotics operation out of his house in a residential neighborhood. Sentenced as an Armed Career Criminal, he now moves for compassionate release under 18 U.S.C. § 3582(c)(1)(A). Based on BOP records, it appears he has exhausted his claim, and it is properly before this Court. Because his claimed medical conditions are not "extraordinary and compelling," and even if they were, because he remains a danger to the community, his motion should be denied.[1]

---

[1] BOP records for Defendant Watkins have been filed as Exhibit A, under seal, with this Court.

Since January 2020, the Bureau of Prisons has been preparing for Covid-19, implementing strict precautions to minimize the virus's spread in its facilities. Following two recent directives from the Attorney General, the Bureau of Prisons is also assessing its entire prison population to determine which inmates face the most risk from Covid-19, pose the least danger to public safety, and can safely be granted home confinement. This process necessarily requires the Bureau of Prisons to identify the best candidates for release, ensure that their homes are suitable for home confinement, and arrange a way to quarantine each of them for 14 days. As of August 19, 2020, these directives have already resulted in at least 7,514 inmates being placed on home confinement—a number that continues to climb.[2] *See* BOP Covid-19 Website.

Watkins does not qualify for compassionate release. Watkins's offense, past behavior, and likelihood of recidivism make him a danger to the community, which precludes release under USSG § 1B1.13(2). And the § 3553(a) factors—which the Court must also consider under § 3582(c)(1)(A)—likewise do not support release.

---

[2] This number was 4,680 inmates on July 6, 2020.

## Background Information

In 2016, Watkins pleaded guilty to being a felon in possession of firearms, as an Armed Career Criminal.  He was running a drug trafficking operation out of a residential home in Detroit.  This Court sentenced him to 180 months, below the guidelines and at the mandatory minimum for his offense.

Watkins is currently incarcerated at Yazoo City Low FCI.  He has served less than half his sentence.  He is scheduled to be released on June 2, 2027.  As will be discussed below, Watkins does not have any CDC recognized health issues that would put him at a higher risk for a more serious outcome if he were to contract Covid-19, but much of those are under control.

Watkins has moved for compassionate release, citing his medical condition and the Covid-19 pandemic. But Watkins cannot overcome the fact that he remains a danger under 18 U.S.C. §3553(a).  His motion should be denied.

## Argument

**I. The Bureau of Prisons has responded to Covid-19 by protecting inmates and increasing home confinement.**

### A. The Bureau of Prisons' precautions have mitigated the risk from Covid-19 within its facilities.

The Bureau of Prisons has reacted quickly to confront Covid-19's spread within its facilities. For over almost a decade, the Bureau of Prisons has maintained a detailed protocol for responding to a pandemic. Consistent with that protocol, the Bureau of Prisons began planning for Covid-19 in January 2020.

On March 13, 2020, the Bureau of Prisons began modifying its operations to implement its Covid-19 Action Plan and minimize the risk of Covid-19 transmission into and inside its facilities. *See* BOP Covid-19 Modified Operations Website. Since then, as the worldwide crisis has evolved, the Bureau of Prisons has repeatedly revised its plan. To stop the spread of the disease, the Bureau of Prisons has restricted inmate movement within and between facilities. *See id.* Only limited group gathering is allowed, and social distancing is maximized. Staff and inmates are also issued face masks to wear in public areas. *See* BOP FAQs: Correcting Myths and Misinformation.

Every newly admitted inmate is screened for Covid-19 risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are provided with medical evaluation and treatment and are isolated from other inmates until testing negative for Covid-19 or being cleared by medical staff under the CDC's criteria. In areas with sustained community transmission, all staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with other symptoms can be placed on leave by a medical officer.

Other access to the facilities has likewise been restricted. Contractors are only permitted access if performing essential services, and any contractor who requires access is screened for symptoms and risk factors. Social and legal visits have been suspended to limit the number of people entering the facility and interacting with inmates. But to ensure that relationships and communication are maintained throughout this disruption, the Bureau of Prisons has increased inmates' telephone allowance to 500 minutes per month. Legal visits are permitted on a case-by-case basis after the attorney has been screened for infection.

Like all other institutions, penal and otherwise, the Bureau of Prisons has not been able to eliminate the risks from Covid-19 completely, despite its best efforts. But the Bureau of Prisons' measures will help federal inmates remain protected from Covid-19 and ensure that they receive any required medical care during these difficult times.

**B.    The Bureau of Prisons is increasing the number of inmates who are granted home confinement.**

The Bureau of Prisons has also responded to Covid-19 by increasing the placement of federal prisoners in home confinement. New legislation now temporarily permits the Bureau of Prisons to "lengthen the maximum amount of time for which [it] is authorized to place a prisoner in home confinement" during the Covid-19 pandemic. Coronavirus Aid, Relief, and Economic Security Act (CARES Act) § 12003(b)(2), Pub. L. No. 116-136, 134 Stat. 281, 516 (Mar. 27, 2020). The Attorney General has also issued two directives, ordering the Bureau of Prisons to use the "various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing Covid-19 pandemic." (03-26-2020 Directive to BOP, at 1; *accord* 04-03-2020 Directive to BOP, at 1). The directives require the Bureau of Prisons to identify the inmates most at risk from Covid-19 and "to consider the totality of circumstances

for each individual inmate" in deciding whether home confinement is appropriate. (03-26-2020 Directive to BOP, at 1).

The Bureau of Prisons' efforts on this point are not hypothetical. Over 4,680 federal inmates have been granted home confinement since the Covid-19 pandemic began, and that number continues to grow. BOP Coronavirus FAQs. As the Attorney General's directives have explained, these home-confinement decisions have required evaluating several criteria:

> 1.) Each inmate's age and vulnerability to Covid-19;
>
> 2.) Whether home confinement would increase or decrease the inmate's risk of contracting Covid-19; and
>
> 3.) Whether the inmate's release into home confinement would risk public safety.

(03-26-2020 Directive to BOP; 04-03-2020 Directive to BOP).

These criteria not only make sense, but also fit the realities of the Covid-19 pandemic far better than any other solution does. The Bureau of Prisons cannot open its facilities' gates indiscriminately and unleash tens of thousands of convicted criminals, en masse. It must focus on the inmates who have the highest risk factors for Covid-19 and are least likely to engage in new criminal activity. This is true not just to protect the public generally, but to avoid the risk that a released defendant will

bring Covid-19 back into the jail or prison system if he violates his terms of release or is caught committing a new crime. *See* 18 U.S.C. § 3624(g)(5); 34 U.S.C. § 60541(g)(2). The Bureau of Prisons' home-confinement initiative thus appropriately focuses on the inmates who will most benefit from release and whose release is least risky.

The Bureau of Prisons must also balance another important consideration: how likely is an inmate to abide by the CDC's social-distancing protocols or other Covid-19-based restrictions on release? If a prisoner would be unlikely to take release conditions or Covid-19 precautions seriously, he would also be far more likely than the general public to contract and spread Covid-19 if released.

Finally, the Bureau of Prisons' home-confinement initiative allows it to marshal and prioritize its limited resources for the inmates and circumstances that are most urgent. For any inmate who is a candidate for home confinement, the Bureau of Prisons must first ensure that his proposed home-confinement location is suitable for release, does not place him at an even greater risk of contracting Covid-19, and does not place members of the public at risk from him. It must assess components of the release plan, including whether the inmate will have access to health

care and other resources. It must consider myriad other factors, including the limited availability of transportation right now and the probation department's reduced ability to supervise inmates who have been released. All of those decisions require channeling resources to the inmates who are the best candidates for release.

Those types of system-wide resource-allocation decisions are difficult even in normal circumstances. That is why Congress tasked the Bureau of Prisons to make them and has not subjected the decisions to judicial review. 18 U.S.C. § 3621(b) ("Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court."); *United States v. Patino*, No. 18- 20451, 2020 WL 1676766, at *6 (E.D. Mich. Apr. 6, 2020) ("[A]s a general rule, the Court lacks authority to direct the operations of the Bureau of Prisons."). It is especially true now, given the Bureau of Prisons' substantial and ongoing efforts to address the Covid-19 pandemic.

## II.   The Court should deny Watkins's motion for compassionate release.

Watkins's motion for a reduced sentence should be denied. A district court has "no inherent authority . . . to modify an otherwise valid sentence." *United States v. Washington*, 584 F.3d 693, 700 (6th Cir. 2009).

Quite the contrary: a district court's authority to modify a defendant's sentence is "narrowly circumscribed." *United States v. Houston*, 529 F.3d 743, 753 n.2 (6th Cir. 2008). Absent a specific statutory exception, a district court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). Those statutory exceptions are narrow. *United States v. Ross*, 245 F.3d 577, 586 (6th Cir. 2001). Compassionate release under 18 U.S.C. § 3582(c)(1)(A) is equally narrow.

He must show "extraordinary and compelling reasons" for compassionate release, and release must be "consistent with" the Sentencing Commission's policy statements. 18 U.S.C. § 3582(c)(1)(A). As with the identical language in § 3582(c)(2), compliance with the policy statements incorporated by § 3582(c)(1)(A) is mandatory. *See Dillon v. United States*, 560 U.S. 817 (2010); *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014). To qualify, a defendant must have a medical condition, age-related issue, family circumstance, or other reason that satisfies the criteria in USSG § 1B1.13(1)(A) & cmt. n.1, and he must "not [be] a danger to the safety of any other person or to the community," USSG § 1B1.13(2).

But even if a defendant is eligible for compassionate release, the district court may not grant the motion unless the factors in 18 U.S.C. § 3553(a) support release. 18 U.S.C. § 3582(c)(1)(A); USSG § 1B1.13. As at sentencing, those factors require the district court to consider the defendant's history and characteristics, the seriousness of the offense, the need to promote respect for the law and provide just punishment for the offense, general and specific deterrence, and the protection of the public. 18 U.S.C. § 3553(a).

### A. Watkins does not have medical conditions that would qualify as an "extraordinary and compelling reason" to grant compassionate release, and he is ineligible due to his dangerousness.

Compassionate release must be "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). Congress tasked the Sentencing Commission with "describ[ing] what should be considered extraordinary and compelling reasons for [a] sentence reduction" under § 3582(c)(1)(A), as well developing "the criteria to be applied and a list of specific examples" for when release is permitted. 28 U.S.C. § 994(t).

Because the Sentencing Commission has fulfilled Congress's directive in USSG § 1B1.13, that policy statement is mandatory. Section

3582(c)(1)(A)'s reliance on the Sentencing Commission's policy statements mirrors the language governing sentence reductions under 18 U.S.C. § 3582(c)(2) for retroactive guideline amendments. *Compare* § 3582(c)(1)(A) *with* § 3582(c)(2). When Congress uses the same language in the same statute, it must be interpreted in the same way. *Marshall*, 954 F.3d at 830. In both contexts, then, the Sentencing Commission's restraints "on a district court's sentence-reduction authority [are] absolute." *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014); *accord Dillon v. United States*, 560 U.S. 817, 830 (2010).

The First Step Act did not change that. It amended only *who* could move for compassionate release under § 3582(c)(1)(A). It did not amend the substantive requirements for release. *United States v. Saldana*, No. 19-7057, 2020 WL 1486892, at *2–*3 (10th Cir. Mar. 26, 2020); *United States v. Mollica*, No. 2:14-CR-329, 2020 WL 1914956, at *4 (N.D. Ala. Apr. 20, 2020). Section 1B1.13 remains binding.

Section 1B1.13 cabins compassionate release to a narrow group of non-dangerous defendants who are most in need. That policy statement limits "extraordinary and compelling reasons" to four categories: (1) the inmate's medical condition; (2) the inmate's age; (3) the inmate's family

circumstances; and (4) other reasons "[a]s determined by the Director of the Bureau of Prisons," which the Bureau of Prisons has set forth in Program Statement 5050.50. USSG § 1B1.13 cmt. n.1. As the Tenth Circuit recently explained, a district court "lack[s] jurisdiction" to grant compassionate release when a defendant's circumstances do not fall within those categories. *Saldana*, 2020 WL 1486892, at *3.

The Covid-19 pandemic does not, by itself, qualify as the type of inmate-specific condition permitting compassionate release. The Bureau of Prisons has worked diligently to implement precautionary measures reducing the risk from Covid-19 to Watkins and other inmates. Thus, as the Third Circuit has explained, "the mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *Raia*, 954 F.3d at 597.

Watkins argues that his hypertension, sickle cell "trait," and his race make him higher risk for a dire outcome if he contracted Covid-19.

Watkins' hypertension is considered "essential."  This type of hypertension is not a risk factor.  For a more thorough discussion, please

see Declaration of John M. Flack, MD, MPH, FAHA, MACP, FASH, *Malam v. Adducci*, No. 20-10829, E.D. MI, R. 115: Supplemental Exhibit, 3943, filed June 15, 2020).  Actually, since July 17, 2020, hypertension was moved to the "might" create a risk, not "will" create a risk.

Watkins does not have sickle cell disease.  The BOP has no record of him suffering from any sickle cell disease, and Watkins has produced no medical records showing it.  Perhaps someone told him when he was younger that he carries the "trait," but that only means that he carries the gene and could pass it on to a child.  *See* cdc.gov/ncbddd/sicklecell/documents/scd%20factsheet_sickle%20cell%20 trait.pdf, last visited August 20, 2020.  Having the trait for sickle cell is completely different than suffering from sickle cell disease.  Without any medical proof, this court should not consider Watkins' claim.

Watkins does not have any medical issues that qualify as "extraordinary and compelling."

Watkins has already contracted—and recovered from—Covid-19. Contrary to defendant's assertion that he "managed to escape with his life," he never went to the hospital.  He was prescribed over the counter medication to control the condition.  The day he visited the medical center

complaining, he did not even have a fever.  They performed a chest xray and the records show nothing remarkable.  So while Watkins did contract the virus, he, like the vast majority of people, did not experience any deadly symptoms.

Watkins points to a study that discusses antibodies from post-Covid-19 patients.  But the article acknowledged that while the results are "interesting and provocative," more research is needed.  And antibodies are not the sole factor at play.  Moreover, the novel corona virus has been around since at least November 2019, and yet, there have been zero reported cases of reinfection.  While there really is no sure way of knowing yet if an individual can be re-infected (and how soon after contracting the virus that would happen), it is more persuasive that it has been almost a year post-discovery without a single reported case of reinfection.  But experts seem to currently agree that the chances one will contract Covid-19 more than once are "highly unlikely" – at least in the short term.  *See* https://www.advisory.com/daily-briefing/2020/07/24/covid-reinfection, last visited August 20, 2020.  Other experts believe it will be years before we know.

On August 24, 2020, a reported reinfection occurred in Hong Kong. But, as one doctor remarked, "[t]he key question is not whether COVID reinfection occurs.  It is whether reinfection will be severe . . . [s]evere reinfections will be very rare, and reinfections won't cause a repeat of the pandemic." *Study Confirms It's Possible to Catch COVID Twice*, https://www.webmd.com/lung/news/20200824/study-confirms-its-possible-to-catch-covid-twice (last visited August 25, 2020).  So even if Watkins catches Covid-19 again (like a seasonal flu, as the study suggests), it will very likely be less serious the second time around.  And with mild symptoms during the initial infection, he is simply not in danger of a dire outcome.

But even if the combination of Watkins's medical conditions and the Covid-19 pandemic satisfied the initial criteria for eligibility in USSG § 1B1.13 cmt. n.1, Watkins would remain ineligible for compassionate release because he is a danger to the community. Section 1B1.13(2) only permits release if a "defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." It thus prohibits the release of violent offenders, including most drug dealers. *See United States v. Stone*, 608 F.3d 939, 947–48 & n.6 (6th Cir. 2010). It also bars the release of many other defendants. An evaluation of

dangerousness under § 3142(g) requires a comprehensive view of community safety—"a broader construction than the mere danger of physical violence." *United States v. Cook*, 880 F.2d 1158, 1161 (10th Cir. 1989) (per curiam).

Adhering to § 1B1.13(2) is especially important given the current strain on society's first responders and the rise in certain types of crime during the Covid-19 pandemic. Police departments in many cities have been stretched to their limits as officers have either contracted Covid-19 or been placed in quarantine. Some cities, including Detroit, have seen spikes in shootings and murders. Child sex predators have taken advantage of bored school-aged kids spending more time online. Covid-19-based fraud schemes have proliferated. There are real risks to public safety right now, and those risks will only increase if our community is faced with a sudden influx of convicted defendants.

Because Watkins's release would endanger the community, § 1B1.13(2) prohibits reducing his sentence under § 3582(c)(1)(A). Watkins is not eligible for compassionate release.

## B. The factors in 18 U.S.C. § 3553(a) strongly weigh against compassionate release.

Even when an inmate has shown "extraordinary and compelling reasons" and demonstrated that he is not dangerous, he is still not entitled to compassionate release. Before ordering relief, the Court must consider the factors set forth in 18 U.S.C. § 3553(a) and determine that release is appropriate. *See United States v. Austin*, No. 15-20609, 2020 WL 2507622, at *3–*5 (E.D. Mich. May 15, 2020) (holding that the "[d]efendant's circumstances do not warrant compassionate release . . . under 18 U.S.C. § 3553(a)"); *United States v. Murphy*, No. 15-20411, 2020 WL 2507619, at *6 (E.D. Mich. May 15, 2020) (denying compassionate release because "the 18 U.S.C. § 3553(a) sentencing factors do not favor release"); *see also United States v. Kincaid*, 802 F. App'x 187, 188–89 (6th Cir. 2020) (upholding a district court's denial of compassionate release based on the § 3553(a) factors). So even if the Court were to find Watkins eligible for compassionate release, the § 3553(a) factors should still disqualify him.

The nature and circumstances of the offense are quite serious. His drug dealings were not small-time, limited transactions. The evidence showed multiple kilo-size packaging, a vacuum sealer and large bags,

multiple cell phones, a jimmy-rigged steel grinder to break down bricks of cocaine or heroin, and other indicia of larger scale drug activity.   The effects of the presence of illegal narcotics in our community cannot be understated: from the distributers smuggling into the country, to the dealers on the street selling hand to hand, to the addicts desperate for the next high, the consequences are far-reaching and long lasting. Inherently, drug trafficking is a dangerous business.   Watkins maintained a firearm at the residence.  His house on Rossini drive, in a residential neighborhood, served as a drug trafficking operation that placed the entire neighborhood in danger.

This defendant has an extensive criminal history that includes a prior drug convictions.  He was on double lifetime probation during the events occurring in this case.  Even while in custody in this case, Watkins had to be disciplined for possessing a cell phone.  (Ex. A: BOP Records).

Releasing him now would not afford adequate deterrence or protect the public.  His motion should be denied.

## IV.   If the Court were to grant Watkins's motion, the United States requests a stay of the Order.

If the Court were inclined to grant Watkins's motion despite the government's arguments above, the government requests that the parties

be notified sufficiently in advance for the government to determine whether it will seek an emergency stay pending a possible appeal to the Sixth Circuit.

## Conclusion

Watkins's motion should be denied.

Respectfully submitted,

MATTHEW SCHNEIDER,
United States Attorney

s/Margaret M. Smith
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226
Phone:  (313) 226-9135
E-Mail: margaret.smith@usdoj.gov
Bar No. P71413

Dated:  August 25, 2020

## Certificate of Service

I hereby certify that on August 25, 2020, I electronically filed the Sentencing Memorandum for the United States with the Clerk of the Court of the Eastern District of Michigan using the ECF system which will send notification of such filing to the following via electronic mail:

Richard M. Helfrick
Richard_Helfrick@fd.org

s/Margaret M. Smith
MARGARET M. SMITH (P71413)
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226
Phone:  (313) 226-9135
E-Mail: margaret.smith@usdoj.gov